FIRST DIVISION

No. 1-05-3358

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| | ) | |
| v. | ) | No. 01 CR 23586 |
| | ) | |
| CHARLES SPICER, | ) | Honorable |
| | ) | Dennis A. Dernbach, |
| Defendant-Appellant. | ) | Judge Presiding. |

MODIFIED OPINION UPON DENIAL OF PETITION FOR REHEARING

JUSTICE ROBERT E. GORDON delivered the Modified Opinion of the court:

Defendant Charles Spicer was convicted after a jury trial of aggravated sexual assault and forgery and sentenced to consecutive terms of 30 years and 5 years of imprisonment, respectively. On appeal, he alleges errors at both trial and sentencing. For the reasons stated below, we affirm.

BACKGROUND

The State claims that on August 8, 2001, the defendant sexually assaulted and wrongfully forced Juanita Cartman, age 75 or 76, to draw a check on her checking account, in her apartment on South Calumet Avenue in Chicago. The defendant attempted to cash the check later that day and was arrested.

At trial, Officer Sheila Jackson testified that on August 8, 2001, at approximately 11 a.m., Officer Jackson responded to a call concerning an elderly robbery victim. She met with the victim in her apartment, where she observed a dining room chair with duct tape on the arm and legs, as well as redness around the victim's wrists and on both arms. The victim provided a description of the offender, which Officer Jackson relayed over the radio.

Pier Thomaston testified that on August 8, 2001, at shortly before noon, she was working as a teller at the Bank One at 6700 South Stony Island when the defendant presented her with a check drawn on the victim's account. She noticed that the name of the payee was not written in the same handwriting as the rest of the check. After seeing an alert for this account on the signature verification screen on her computer, she left the defendant and went to speak with her supervisor. A bank security guard approached the defendant, who then shoved the guard and ran out the front door, with the guard giving chase.

The teller testified that while looking through the bank windows, she saw the defendant go over a fence at a construction site and then lost sight of him. Approximately 10 minutes later, she identified a person in the back of a police squad car as the customer who had just presented her with the victim's check. Terrence McCullough, the security guard, also identified the defendant as the man at the teller's window whom he chased before police arrived and whom he identified in the back of the police vehicle.

Officer Harlan Hasbrough testified that on August 8, 2001, he responded to a radio call shortly after noon and went to 1523 East 68th Street to look for a suspect who had run from the bank. He found the defendant under the porch of an apartment at that address.

2

Detective Raymond Doherty[1] testified that he and his partner, Detective Gillespie, were assigned to a robbery investigation on August 8, 2001, and met with Officer Jackson and the victim in the victim's apartment. After hearing a call on the radio, he went to the bank, where he saw the defendant in the back of a police vehicle that was parked near the bank, and recovered a check from the teller who said the defendant had tried to cash it. He then returned to the victim's apartment and took the victim to the police station where the defendant was also taken.

Detective Doherty testified that at approximately 1 p.m. on August 8 he and his partner interviewed the victim, and at 1:30 p.m. they interviewed the defendant. Defendant told them that he had received a telephone call from a friend named John Thomas that morning; that when he later met Thomas, Thomas gave defendant a check to cash; and that a security guard at the bank tried to detain him. Detective Doherty testified that the defendant provided a vague description of John Thomas, whom Detective Doherty was unable to locate.

Detective Doherty testified that he and his partner interviewed defendant again at 5:30 p.m. on August 8. Defendant then admitted going to the victim's apartment with Thomas and stated that the victim owed him money and that both he and Thomas left after a short conversation. Detective Doherty testified that the defendant then told him that Thomas gave the defendant some money that Thomas had taken from the victim's home and a check. The defendant also admitted to duct taping the victim to the chair after she signed the check.

---

[1]Raymond Doherty was a sergeant at the time of trial and a detective at the time of the investigation.

Detective Doherty then interviewed the victim again at approximately 6 p.m. When she became upset, he decided to take her to a hospital. The victim had previously refused medical attention. Before leaving for the hospital, Detective Doherty called for an evidence technician to take a buccal swab of the defendant. Then he transported the victim to the hospital and remained while she was there, transporting her home at approximately 3 a.m. the following morning. He had an evidence technician meet him at the victim's home to collect her bedding.

Detective Doherty testified that he returned to work at approximately 9 a.m. on August 9 and spoke to the defendant several times that day. The first interview occurred at approximately 1 p.m. The detective testified that he told the defendant that he did not believe him. The defendant then told him that he was in the apartment with the victim, that he told her to sign the check and that if she did not, he would "shove the pen up her ass." Approximately three hours later that day, Detective Doherty had another interview with the defendant in which the detective told the defendant that he did not believe the defendant's "story" and that he thought the defendant was "holding back some information." Then the defendant gave essentially the same statement that he later repeated in front of Assistant State's Attorney (ASA) James Lynch.

Detective Doherty testified that at approximately 4:30 p.m., ASA Lynch interviewed the defendant with Detective Doherty and his partner present. The statement was written down by hand by ASA Lynch, and reviewed and signed by defendant.

ASA Lynch testified that he went to the police station at approximately 1:15 p.m. and questioned the defendant twice that afternoon. At approximately 2:30 p.m., defendant gave a statement in which "he was denying the essentials of any sexual crimes against" the victim. At

4

approximately 4:30 p.m., ASA Lynch took an oral statement from the defendant, which was consistent with the statement that Lynch later wrote down. At 5:15 p.m, ASA Lynch began writing the statement down by hand, with the defendant sitting next to him and using a question and answer format. The written statement was signed by ASA Lynch, Detective Doherty and the defendant. ASA Lynch read the statement to the jury.

In the statement, the defendant stated that he was 41 years old and that he had cleaned up the victim's basement and around her house several times. On August 8, 2001, he went to the victim's apartment with his friend John Thomas to speak to her about money which he felt that she owed him for the work. He followed her into her bedroom, stating that he wanted his money. Then he went into the kitchen, where his friend John Thomas was located. John had followed them inside the apartment and the defendant did not believe that the victim had seen John.

The statement further claimed that defendant received a roll of duct tape from John and then went back into the bedroom and taped the victim's ankles together as she sat on the bed. He told her to lie down and he started to tape her wrists, but stopped because the victim complained that her arm hurt. The victim then told him that there was money in a beer stein in the kitchen. He went into the kitchen and John retrieved $90 from the stein. He then went back to the victim and told her that it was not enough money. He and John then removed $35 from her purse. The defendant received $60 of the money, and John received the rest and left.

The statement claimed that defendant then demanded more money. When the victim stated that she had no more money, defendant said that he had seen her bank statement and knew she had $10,000 in the bank, and told the victim to write him a check. He then went into the

5

kitchen to bring the victim water and her checkbook. When he returned, the victim stated that she had to go to the bathroom. He carried her to the toilet and moved her gown aside for her. When she was done, he carried her back to the bed.

The statement further claimed that defendant kept ordering the victim to write him a check and the victim kept refusing. Eventually, he picked up her taped feet, placed them on the bed with her knees up and threatened to shove a pen "up her ass." He then placed his penis on her thigh and placed the index finger of his left hand in her vagina up to the knuckle and then shook the bed with his knees. The victim then said that she would write the check.

The statement claimed that defendant retrieved the checkbook for the victim. He cut the tape from her ankles and handed her glasses to her so she could write the check. The victim went to the dresser to write the check, and defendant told her to write the check in the amount of $7,000, leaving the payee blank and writing "remodeling" on the memo line. The defendant then took the victim into the dining room, sat her down in a chair, and taped her hands and ankles to the arms and legs of the chair. He then gave her some water, placed a fan on her and left with the check.

The statement claimed that defendant first tried unsuccessfully to find someone to cash the check and then he went to the bank. After writing his name on the check as payee, he gave the check to the teller to cash. Another lady, other than the teller, told security to hold him and he broke free from security and ran. He ran to a place where he previously lived and hid under the stairs until he was found by the police.

Dr. Jeffrey Lahti testified that he was working in the emergency room at Christ Hospital

on August 8, 2001. The victim was brought to the hospital at approximately 10 p.m., and examined at around 3 a.m. on August 9 "for an evaluation for a sexual assault." During his interview, the victim stated that she had been "tied and raped." The pelvic examination was normal. He did observe redness on her wrists and redness and swelling of her left ankle.

John Onstwedder testified as an expert in fingerprint analysis, employed in the crime laboratory of the Illinois State Police. He examined the check presented on August 8 and found two fingerprints on the check which he compared with a fingerprint standard for the defendant. One print on the check was not clear enough for analysis but the other print matched the defendant's right thumb. He was unable to retrieve prints on the duct tape that he had received from the crime scene.

Jennifer Reynolds, an employee of Cellmark, a private laboratory, was qualified as an expert in DNA analysis. She testified that she conducted the DNA testing on the vaginal swab, and there was no DNA found on the swab belonging to anyone other than the victim.

Dr. Jennifer McCritchie testified as a DNA expert with the Illinois State Police. The vaginal, oral and rectal swabs from the victim did not contain semen, and neither did the fitted bedsheet. A semen stain was found on the victim's nightgown and housecoat. Neither semen stain contained sperm cells. On the nonsperm fraction of the nightgown stain there was a match to defendant's DNA in 7 of the 13 genetic markers, but 4 of those areas contained only partial information. Statistical analysis was performed on the other three areas, and the witness testified that "the profile that I found would be expected to occur in 1 of 190,000 black; 1 in 410,000 white; or 1 in 1,000,000 Hispanic unrelated individuals.."

7

Dr. Miguel Stubbs testified that he had been treating the victim at a nursing home in Georgia since 2002. When she was admitted, she was 75 or 76 years old. She was suffering from moderate to severe dementia and a past stroke. When he first met the victim in 2002, she was already suffering from mild to moderate dementia and that the progression of such a condition takes a number of years.

The State rested after presenting the above witnesses, and the defense moved for a directed verdict, which was granted for counts IV and VIII. These counts had alleged criminal sexual assault based on penetration of the vagina by the defendant's penis. The defense did not present any evidence in its case in chief.

Jury deliberations began on July 28 and lasted for eight hours. On the second day of deliberations, the foreperson stated they did not have a unanimous verdict on one of the three counts and the jury was split 11 to 1. An hour later, the jurors sent a note stating that they had stopped deliberations, believing that they would not reach a unanimous verdict. Over defendant's objection, the trial court read the jury the Prim instruction, and the jury continued deliberating. Later that day, the jury did reach unanimous verdicts, finding defendant guilty of aggravated criminal sexual assault and forgery, and finding defendant not guilty of residential burglary.

The trial court sentenced defendant to 30 years imprisonment for the aggravated sexual assault count and 5 years imprisonment for the forgery count, with the sentences to be served consecutively. This appeal followed.

ANALYSIS

Defendant appeals claiming: (1) that the doctor's testimony that the victim stated that she had been "tied and raped" was inadmissible hearsay and violated his sixth amendment right to confrontation; (2) that the State failed to prove forgery beyond a reasonable doubt; (3) that the defendant was denied a fair trial because the jury was subjected to improper closing arguments concerning the law of forgery; and (4) that the defendant was denied a fair sentencing hearing.

Doctor's Report of Victim's Statement

Defendant claims that it was error for the trial court to admit the doctor's testimony concerning the victim's statement that she was "tied and raped" because, first, the statement did not fall within the hearsay exception for statements made for the purposes of medical diagnosis; and second, because the admission of the statement violated defendant's sixth amendment right to confront the witnesses against him.

This court will review this claim for plain error. Although the defense filed a pretrial motion seeking to exclude the victim's statement to the doctor on confrontation clause grounds and the defense objected again at trial during the doctor's testimony,[2] the defense failed to raise the issue in his posttrial motion. The Illinois Supreme Court has held that a "defendant must both

---

[2]At trial, the following exchange occurred. Defense counsel asked: "Dr. Lahti, when you interviewed Ms. Cartman, what did she say had been done to her?" The defense counsel stated: "Objection." The court responded: "Overruled." The doctor answered: "She said she was tied and raped."

9

specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." People v. Woods, 214 Ill. 2d 455, 470 (2005); People v. Piatowski, 225 Ill. 2d 551, 564 (2007). Although defendant did object to the statement at trial, defendant's posttrial motion raised nine separate claims but none claimed a hearsay error, a sixth amendment violation or any issue with respect to the doctor's testimony. Defendant concedes in his brief to this court that he failed to raise the issue in his posttrial motion.

However, even when the defendant has failed to preserve an error for review, an appellate court may still review for plain error. "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." Piatowski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471. However, if there is no error at all, we need not reach the question of plain error. Piatowski, 225 Ill. 2d at 565 (plain error doctrine requires "first" that an error occurred); People v. Nicholas, 218 Ill. 2d 104, 121 (2006) (where "there was no error at all," there cannot be plain error).

The Illinois Supreme Court has held that when reviewing the admissibility of a hearsay statement, an appellate court must determine, first, whether the statement met the statutory requirements of a hearsay exception. Only if the court determines that the statement qualifies as a hearsay exception may the court then proceed to consider the sixth amendment issue. People v.

<u>Melchor</u>, 226 Ill. 2d 24, 34-35 (2007) (vacated appellate court opinion and remanded with instructions to consider the hearsay exception first before proceeding to the sixth amendment issue).

Hearsay analysis and sixth amendment analysis are completely different. A statement may be admissible under hearsay rules but barred by the sixth amendment and vice versa. As the Supreme Court observed, "[a]n off-hand, overhead remark" may be excluded by hearsay rules but permitted by the confrontation clause, while "<u>ex parte</u> examinations" are sometimes admissible under modern hearsay rules but not "condoned" by the sixth amendment. <u>Crawford v. Washington</u>, 541 U.S. 36, 51, 158 L.Ed2d 177 <u>192</u>, 124 S. Ct. 1354, <u>1364</u> (2004).

The rule against hearsay generally prevents the introduction at trial of out-of-court statements offered to prove the truth of the matter asserted. <u>People v. Murdock</u>, 259 Ill. App. 3d 1014, 1024 (1994). However, the rule has many exceptions. Section 5/115-13 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-13 (West 2000) provides a statutory exception to the hearsay rule, for statements made for purposes of medical diagnosis. It states in full:

> "In a prosecution for violation of Section 12-13, 12-14, 12-14.1,
> 12-15 or 12-16 of the 'Criminal Code of 1961,' statements made by the
> victim to medical personnel for purposes of medical diagnosis or treatment
> including descriptions of the cause of symptom, pain or sensations, or the
> inception or general character of the cause or external source thereof
> insofar as reasonably pertinent to diagnosis or treatment shall be admitted
> as an exception to the hearsay rule." 725 ILCS 5/115-13 (West 2000).

The above exception by this statute applies only in sexual assault cases. The five statutory sections listed in the exception are for, respectively: (1) criminal sexual assault; (2) aggravated criminal sexual assault; (3) predatory criminal sexual assault of a child; (4) criminal sexual abuse; and (5) aggravated criminal sexual abuse (720 ILCS 5/12-13, 12-4.1, 12-15, 12-16) (West 2000)).

A trial court is "vested with discretion" in determining whether a victim's statements to a physician fall within the medical diagnosis exception to the hearsay rule. Thus, this court will reverse only for an abuse of discretion of a trial court's determination that the medical diagnosis exception applies. People v. Davis, 337 Ill. App. 3d 977, 989-90 (2003).

Defendant claims that the trial court erred in admitting the victim's statement under the medical diagnosis exception because the victim allegedly did not go to the doctor for treatment but rather for evidence collection purposes. [3] Defendant has failed to cite a single case to support his claim. In addition, the Illinois Supreme Court has previously rejected the distinction that defendant asks this court to draw between examining and treating physicians. People v. Falaster, 173 Ill. 2d 220, 229-30 (1996).

In Falaster, a child claimed that she had been abused by her father for years. Falaster, 173 Ill. 2d at 222-23. After the child victim contacted the authorities, she was referred to a registered

---

[3]Defendant does not claim that the particular statement at issue, that the victim was "tied and raped," was not pertinent to the victim's diagnosis and treatment. Instead, defendant claims that the entire examination was for evidentiary rather than diagnostic purposes.

nurse who took a history from the victim, prior to a physical examination. <u>Falaster</u>, 173 Ill. 2d at 223. The defendant objected to the nurse's testimony about the victim's history on the ground that "the victim underwent the examination solely as a means of developing evidence for use in a subsequent prosecution." <u>Falaster</u>, 173 Ill. 2d at 229.

Holding that the victim's history was "within the scope" of the statutory exception, the supreme court stated that "the diagnostic purpose of the examination" was not "incompatible with its investigatory function," and that "the statute does not distinguish between examining physicians and treating physicians." <u>Falaster</u>, 173 Ill. 2d at 229-30; <u>People v. Rushing</u>, 192 Ill. App. 3d 444, 453 (1989) (holding that the medical diagnosis exception "does not provide for a distinction between examining physicians and treating physicians," this court noted that the statutory "reference to diagnosis or treatment evinces a legislative intent *** not to limit the testimony only to treating physicians").

Similarly, in the case at bar, the diagnostic purpose of the examination was not incompatible with its investigative function. After answering questions at a police station, the victim was taken by a police detective to the emergency room of a hospital. During the evaluation by the emergency room physician, the victim told the doctor that she had been "tied and raped."

Almost all emergency room visits by sexual assault victims will have both evidence collection aspects and medical aspects. If we were to hold that an evidence collection purpose made statements from a sexual assault evaluation inadmissible, we would in effect obliterate the statute, which applies only in sexual assault cases. See <u>People v. West</u>, 355 Ill. App. 3d 28, 37

13

(2005) (victim's description of sexual assault to emergency room physician and nurse was within statutory exception for medical diagnosis).

Since we hold that the victim's statement to the doctor falls within the medical diagnosis exception to the hearsay rule, we now proceed to the confrontation clause issue. Melchor, 226 Ill. 2d at 34 (appellate court may proceed to sixth amendment issue after first determining that the trial court's hearsay ruling was correct). The defendant claims that introduction of the victim's statement that she was "tied and raped" violated his sixth amendment right to confront the witnesses against him, since the victim was unavailable to testify at trial.

There is no dispute that the victim was unavailable to testify at trial. The parties stipulated prior to a trial that a doctor currently treating the victim would testify that the victim was not available to testify at trial due to a serious medical condition unrelated to the charges against defendant. Between the time of the incident and the time of defendant's trial, the elderly victim had been admitted to a nursing home, suffering from moderate to severe dementia.

In People v. Purcell, 364 Ill. App. 3d 283 (2006), the appellate court discussed the appropriate standard of review for a claim that a trial court admitted a hearsay statement in violation of the sixth amendment. We held that we will defer to a trial court's evidentiary ruling " ' "unless the trial court's exercise of discretion has been frustrated by an erroneous rule of law." ' [Citations.]" Purcell, 364 Ill. App. 3d at 293.

The sixth amendment to the United States Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S. Const., amend. VI. This part of the sixth amendment is known as the

14

confrontation clause and applies to the states through the fourteenth amendment. People v. Stechly, 225 Ill. 2d 246, 264 (2007).

In 2004, with Crawford v. Washington, 541 U.S. 36, 158 L.Ed. 2d 177, 124 S. Ct. 1254 (2004), the United States Supreme Court "fundamentally altered its approach to confrontation clause analysis." Stechly, 225 Ill. 2d at 264-65. Prior to Crawford, the United States Supreme Court had held that the sixth amendment permitted the introduction of hearsay statements by unavailable declarants, so long as the statements had " 'adequate "indicia of reliability. " ' " Stechly, 225 Ill. 2d at 264, discussing and quoting Ohio v. Roberts, 448 U.S. 56, 66, 65 L.Ed. 2d 597, 608, 100 S. Ct. 2531, 2589 (1980).

In Crawford, the United States Supreme Court held: "[w]here testimonial statements are at issue, the only indicum of reliability sufficient to satisfy constitutional demands is the one the Constitution actually proscribes: confrontation." Crawford, 541 U.S. at 68-69, 158 L.Ed. 2$^d$ at 203, 124 S. Ct. at 1374. Since, in the case at bar, there was no opportunity for cross-examination, the only question is whether the victim's statement to the emergency-room physician was "testimonial."

Unfortunately, "the Crawford Court explicitly declined to define what exactly makes a statement 'testimonial.' " Stechly, 225 Ill. 2d at 266 (discussing Crawford). After noting several possible definitions of "testimonial," the Crawford Court declined to adopt one, stating "[w]e leave for another day any effort to spell out a comprehensive definition of 'testimonial.' " Crawford, 541 U.S. at 51-52, 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. The Court noted that "[r]egardless of the precise articulation, some statements qualify under any definition."

15

Crawford, 541 U.S. at 52 158 L. Ed. 2d at 193, 124 S. Ct. at 1364. The Court held: "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.

In Davis v. Washington, 547 U.S. ___, ___, 165 L.Ed. 2d 224, 237-38, 126 S. Ct. 2266, 2273-74 (2006), the United States Supreme Court modified the part of its Crawford holding that concerned police interrogation. In Davis, the Court held that some responses to police interrogation were testimonial, while others were not. Davis, 547 U.S. ___, 165 L.Ed. 2d at 237, 126 S. Ct. at 2273-74. The Davis Court drew the following distinction:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis, 547 U.S. ___, 165 L.Ed. 2d at 237, 126 S. Ct. at 2273-74.

Thus, to apply Davis, we must determine whether the questioning qualified as "police"

16

questioning[4] and whether the "primary purpose" was "to meet an ongoing emergency" or to "prove past events." Davis, 547 U.S. ___, 165 L.Ed. 2d at 237, 126 S. Ct. at 2273-74.

The second question is easier to answer than the first, because in Davis the Court assumed without deciding that the 911 operators at issue in Davis were police agents. Davis, 547 U.S. at ___ n.2, 165 L.Ed. 2d at 238 n.2, 126 S. Ct. at 2274 n.2. [5]As a result, the Davis Court focused on the second question, providing many examples and guidelines for analyzing "primary purpose" but providing little guidance for determining what constitutes "police" interrogation. The Court left open for another day the question of "when statements made to someone other than law enforcement personnel are 'testimonial.' " Davis, 547 U.S. at ___ n.2, 165 L.Ed. 2d at 238 n.2, 126 S. Ct. at 2274 n.2.

Pursuant to the guidelines and examples provided by the Davis Court, there is no doubt that the primary purpose in the case at bar was to "prove past events" rather than to "meet an

---

[4] In Crawford, the United States Supreme Court stated that "the term 'interrogation' " was to be used "in its colloquial, rather than any technical legal [] sense." Crawford, 541 U.S. at 53 n.4, 158 L.Ed. 2d at 194 n.4, S. Ct. at 1365 n.4; West, 355 Ill. App. 3d at 35 ("according to Crawford, the term 'interrogation' is to be viewed in a colloquial, rather than a technical, sense").

[5] The Davis Court stated: "If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police." . Davis, 547 U.S. at ___ n.2, 165 L. Ed. 2d at 238 n.2, 126 S. Ct. at 2274 n.2.

17

ongoing emergency." In Davis, the Court listed four factors that point to an ongoing emergency: (1) the declarant "was speaking about events as they were actually happening", (2) the statement was "a call for help against [a] bona fide physical threat"; (3) "the *** statements were necessary to be able to resolve the present emergency"; and (4) the declarant was not "responding calmly" and was instead giving "frantic answers." Davis, 547 U.S. at ___, 165 L.Ed. 2d at 240, 126 S. Ct. at 2276, 2277 (emphasis in original).

All four factors support a finding that the statement at bar was to prove past events. First, when the victim told the doctor that she had been "tied and raped," she was not speaking about events as they were actually happening but rather about an event that had happened the day before. Second, her statement to the doctor was not a present cry for help against an existing physical threat, since she was safe in the hospital. Third, the statement was not intended to resolve a present emergency; in fact, the victim had stated that she did not want to see a doctor and the police waited approximately seven hours before transporting her to a hospital. Fourth, although the elderly victim was upset and cried several times during the male doctor's examination of her, there is nothing in the record to suggest that she was "frantic."

In Davis, the Court discussed a rape case as an example. Davis, 547 U.S. at ___, 165 L. Ed. 2d at 241, 126 S. Ct. at 2277. In the case discussed, a young girl had " 'immediately on her coming home, told all the circumstances of her injury, to her mother. [Citation.]" Davis, 547 U.S. at ___, 165 L. Ed. 2d at 241, 126 S. Ct. at 2277. The Court stated that if the statement had recounted "the girl's screams for aid as she was being chased by her assailant" then the statement would have concerned an ongoing emergency. Davis, 547 U.S. at ___, 165 L. Ed. 2d at 241, 126

18

S. Ct. at 2277. However, "by the time the victim got home, her story was an account of past events." Davis, 547 U.S. at ___, 165 L. Ed. 2d at 241, 126 S. Ct. at 2277. Similarly, in the case at bar, by the time the victim had been questioned at the police station and then transported by police to a hospital, her story was an account of past events.

Thus, in the instant case, if the victim had made her statement about past events to a police officer, it would have qualified as testimonial pursuant to Davis. West, 355 Ill. App. 3d at 35 (statements made at hospital by sexual assault victim to police officers were testimonial for purposes of Crawford). The question then is whether our holding should be different because the police officer transported her to a doctor, so that the doctor took the statement instead of the officer who was waiting in the hospital.

The United States Supreme Court has stated that most cases applying the confrontation clause "involved testimonial statements of the most formal sort -- sworn testimony in prior judicial proceedings or formal depositions under oath." Davis, 547 U.S. at ___, 165 L. Ed. 2d at 239, 126 S. Ct. at 2275-76. In Crawford, the Supreme Court found that modern police interrogations were also testimonial because "[p]olice interrogations bear a striking resemblance to examinations by justices of the peace in England." Crawford, 541 U.S. at 52, 158 L. Ed. 2d at 193, 124 S. Ct. at 1364. The Court found that both had "an essentially investigative and prosecutorial function." Crawford, 541 U.S. at 53, 158 L. Ed. 2d at 194, 124 S. Ct. at 1365..

While the old English magistrate and the modern American police officer had a single essential function which was to investigate, the issue of a doctor in a rape case is more complicated because the doctor has a dual function, both to investigate the alleged crime and to

19

treat the victim medically. For example, the doctor in the case at bar served an investigative function by completing a rape kit, which required him to comb the victim's head and pubic hair looking for other people's hair and to obtain oral, vaginal and rectal swabs to check for the presence of other people's bodily fluids. As the doctor explained on the stand, he was "to look for evidence."

In Davis, the United States Supreme Court held that "we do not think it [is] conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman recite the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition." Davis, 547 U.S. at ___, 165 L. Ed. 2d at 239, 126 S. Ct. at 2276 (emphasis omitted). Similarly, this court finds that the protections of the confrontation clause cannot be evaded by having the note-taking policeman simply bring the victim to a note-taking doctor.[6]

In Stechly, the Illinois Supreme Court held that statements of a sexual abuse victim to a nurse in an emergency room were "unquestionably" testimonial under Davis and thus barred by

---

[6] Our opinion "in no way impugned" the police officer's action in bringing the victim to the doctor. Davis, 547 U.S. at ___ n.6, 165 L. Ed. 2d at 243 n.6, 126 S. Ct. at 2279 n.6. Unlike other constitutional clauses such as the Fourth Amendment's guarantee against unreasonable search and seizure, the confrontation clause "in no way governs police conduct." Davis, 547 U.S. at ___ n.6, 165 L. Ed. 2d at 243 n.6, 126 S. Ct. at 2279 n.6. The Confrontation Clause regulates "the trial use of" properly obtained statements. Davis, 547 U.S. at ___ n.6, 165 L. Ed. 2d at 243 n.6, 126 S. Ct. at 2279 n.6.

20

the confrontation clause, where the victim was unavailable for cross-examination. Stechly, 225 Ill. 2d at 299. The victim's statements to the nurse concerned both the perpetrator's identity and the nature of the abuse. Stechly, 225 Ill. 2d at 252, 256. The Illinois Supreme Court held that the nurse in Stechly was acting as an "agent[] *** for purposes of confrontation clause analysis" because the nurse took no further action other than to pass information on to the authorities. Stechly, 225 Ill. 2d at 300-01. Similarly, in the case at bar, the emergency room doctor testified that he took no further action after performing "an evaluation for sexual assault," which included completing the rape kit. Thus Stechly requires a finding in the case at bar that the statement was testimonial.

Prior to Stechly, the appellate court in West held that a sexual assault victim's statements about the nature of her assault to an emergency room doctor were not testimonial. West, 355 Ill. App. 3d at 37.[7] However, this decision was prior to both the Illinois Supreme Court's decision in Stechly and the United States Supreme Court's decision in Davis.[8]

---

[7]The court in West held that while a sexual assault victim's statements about the nature of her assault to a police officer were testimonial, her subsequent, similar statements to an emergency room doctor were not. West, 355 Ill. App. 3d at 37.

[8] In West, the appellate court held that the victim's statements to the doctor about the nature of the attack were nontestimonial and thus admissible under the sixth amendment, whereas the victim's statements to the doctor about the identity of the perpetrator were testimonial and thus not admissible. West, 355 Ill. App. 3d at 37. As noted above, the Illinois Supreme Court in

No. 1-05-3358

Having found a confrontation clause violation, we must next determine whether the error was "harmless beyond a reasonable doubt." "Crawford violations are subject to harmless-error analysis." Stechly, 225 Ill. 2d at 304; People v. Thompson, 349 Ill. App. 3d 587, 594 (2004) (applying harmless error analysis to confrontation clause error). An error is harmless if "it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." Stechly, 225 Ill. 2d at 304; People v. Nitz, 219 Ill. 2d 400, 410 (2006) (error is harmless if "the result would have been the same absent the error").

To determine whether an error was harmless, this court must consider: (1) whether the error "might have contributed to the conviction"; (2) whether other evidence is "overwhelming" in support of the conviction; and (3) whether the erroneously admitted evidence is "cumulative or duplicates properly admitted evidence." Stechly, 225 Ill. 2d at 304-05; Thompson, 349 Ill. App. 3d at 594 (same).

The "tied and raped" statement was admitted to support the conviction for aggravated criminal sexual assault (720 ILCS 5/12-14 (West 2000)). A person is guilty of "aggravated criminal sexual assault" if he commits "criminal sexual assault" on a victim 60 years of age or older, 720 ILCS 5/12-14 (a)(5) (West 2000)). A person is guilty of "criminal sexual assault" if he "commits an act of sexual penetration by the use of force," 720 ILCS 5/12-13(a)(1) (West 2000).

---

Stechly held inadmissible the victim's statements about both the identity of the perpetrator and the nature of the sexual abuse. Stechly, 225 Ill. 2d at 252, 256. The supreme court did not draw the same distinction between identity and nature of the assault that the appellate court did.

22

"Sexual penetration" is defined as either: "any contact *** between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person," or "any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person." 720 ILCS 5/12- 12(f) (West 2006). Since the essential elements of a crime must be proved beyond a reasonable doubt, the state had the burden of proving penetration beyond a reasonable doubt. People v. Wheeler, 226 Ill. 2d 92, 114 (2007) (due process requires proof beyond a reasonable doubt of "the essential elements of the crime").

The only evidence[9] of the element[10] of penetration consisted of: 1. the defendant's statement, transcribed by ASA Lynch, that the defendant inserted his finger into the victim's vagina;[11] and (2) the victim's statement to the doctor that she was "raped." Finger insertion falls

---

[9]The semen found on the victim's housecoat is not evidence of penetration. It is consistent with the defendant' statement that he placed his penis on the victim's thigh and did not penetrate. In fact, it could be argued that the presence of semen on the housecoat and not on the vaginal or anal swabs is evidence of a lack of penetration.

[10]The defendant was not charged with criminal sexual abuse which would have required only sexual conduct and not penetration (720 ILCS 5/12-15 (West 2000). "Sexual conduct' includes "any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim" (720 ILCS 5/12-12(e) (West 2000).

[11]The defendant's statement that he placed his penis on the victim's thigh was not evidence of "penetration" as defined in the statute. The statute requires either intrusion or a certain type of

23

withing the statute's definition of "penetration." Penetration is defined as including "any intrusion" by "any part of the body," such as a finger, into the victim's vagina. 720 ILCS 5/12-12(f)(2000).

Applying the three-part harmless error analysis, we find the error to be harmless. First, it is doubtful that the victim's statement contributed to the jury's finding of penetration. Thompson, 349 Ill. App. 3d at 594 (first prong of harmless error analysis requires the court to consider whether error "might have contributed to the conviction"). The doctor's entire report of the victim's account of the crime was a mere seven words long: "She said she was tied and raped." When those seven words are compared against the detailed, multipage and signed confession of the defendant, it is hard to believe that the victim's statement had much impact.

Second, the defendant's statement was "overwhelming"[12] evidence in support of his

---

contact. First, placing his penis on the victim's thigh was not an intrusion into her "sex organ" or anus, as the statute requires. Second, the act did qualify as a "contact" either. To be a "contact," his penis would have to come in contact with "an object, the sex organ, mouth or anus" of the victim. Her thigh is not an object or sex organ, so it does not fall within the plain language of the statute. Later in the same sentence, the legislators used the words "any part of the body," but they chose not to use it here.

[12]The defendant's statement by itself was, without a doubt, sufficient evidence for a jury to find the defendant guilty of penetration. People v. McIntosh, 305 Ill. App. 3d 462, 467-68 (1999) (victim's statement was sufficient to prove sexual assault beyond a reasonable doubt).

24

conviction. Thompson, 349 Ill. App. 3d at 594 (second prong of a harmless error analysis requires the court to consider whether other evidence was "overwhelming"). Defendant's statement was never recanted and never refuted. Prior to trial, the defendant moved to suppress his statement on the ground that he was in pain from injuries and suffering from heroin and alcohol withdrawal. During the suppression hearing, he testified about his pain and suffering. However, he never once claimed that the statement was not the truth; [13] and we cannot find evidence in the record which contradicts the defendant's statement.

Since the defendant's statement was unrecanted and unrefuted, it is completely distinguishable from the statement in Thompson, which this court found was not "overwhelming" evidence. Thompson, 349 Ill. App. 3d at 595. In Thompson, the defendant was accused of assault, and the evidence of assault consisted of: police and medical testimony concerning the physical condition of the victim and the site; the defendant's inculpatory statements; and the

---

However, the question on this appeal is not whether the defendant's statement was sufficient evidence, but whether it was such overwhelming evidence that admission of the victim's statement was harmless error beyond a reasonable doubt. We find that it was.

[13]At the suppression hearing, the assistant State's Attorney asked the defendant: "I take it then that you don't remember giving all of the details that are contained in this 6 page statement? You don't remember telling the state's attorney that information?" The defendant responded: "I recollect."

victim's statements. Thompson, 349 Ill. App. 3d at 594. After finding that admission of the victim's statements violated the defendant's right to confrontation, this court then found that the error was not harmless because the other evidence was not "overwhelming." Thompson, 349 Ill. App. 3d at 594-95. In finding that the other evidence was not overwhelming, this court noted that the defendant had testified at trial and refuted the earlier inculpatory statements attributed to him. Thompson, 349 Ill. App. 3d at 594-95. Thus unlike the defendant's admission in the case at bar, the defendant's admission in Thompson was recanted and refuted.

Third, it is difficult to assess whether the victim's statement of being "raped" was cumulative of other properly admitted evidence. The defendant's confession admitted only finger penetration. Without the victim on the stand, it is difficult to ascertain what she meant by the word "rape," whether or not in her mind the term was broad enough to include finger penetration. However, considering the overwhelming nature of the other evidence, this court finds that the confrontation clause error was harmless beyond a reasonable doubt. Since the error was harmless, we do not have to consider whether it rose to the level of plain error.

In his petition for a rehearing, defendant cited the Illinois Supreme Court's opinion in People v. Stechly, 225 Ill. 2d 246, 305 (2007) for the proposition that a sexual assault victim's statement about the attack will always have an impact upon the jury. In Stechly, the supreme court held that the admission of a nontestifying victim's statements violated the defendant's confrontation clause rights and was not harmless error. Stechly, 225 Ill. 2d at 302, 305. The supreme court observed: "'[t]hestatements of a victim identifying her attacker and describing the attack are extremely powerful evidence of a defendant's guilt. It would be difficult to argue that

26

such statements did not contribute to [a guilty] verdict." Stechly, 225 Ill. 2d at 305 (brackets in original), quoting dicta in People v. Patterson, 217 Ill. 2d 407, 436 (2005).

Comparing the magnitude of the error in Stechly to the error in our case is like comparing an elephant to a pin. The wrongfully admitted evidence in Stechly consisted of multiple, lengthy and detailed statements. Stechly, 225 Ill. 2d at 305. When recounting one of the child victim's statements, even the social worker noted that the statement was unusually long and comprehensive. Stechly, 225 Ill. 2d at 253. The testimony included the child's "demonstration of the conduct at issue through the use of dolls." Stechly, 225 Ill. 2d at 305. In describing the harm done by the admission of these statements, the supreme court noted the statements were "precise," "clear" and "consistent with each other." Stechly, 225 Ill. 2d at 305. The supreme court was particularly troubled by the fact that the "child's consistent repetition of the story strongly reinforced its believability." Stechly, 225 Ill. 2d at 309 (emphasis in original). The supreme court did not find the other evidence overwhelming because at trial the defendant recanted his prior confession and there were inconsistencies in the witnesses' testimony. Stechly, 225 Ill. 2d at 305-08.

By contrast, in the case at bar, there was no repetition and no demonstrations with dolls. There were no concerns about reinforcement through consistency, because there was only one statement. The one statement was neither lengthy nor detailed. In the case at bar, it was the defendant's confession that was lengthy and detailed, not the victim's statement. The victim's three-word "tied and raped" statement is not the sort of attack description that our supreme court was worried would become "'powerful evidence.'" Stechly, 225 Ill. 2d at 305, quoting

27

Patterson, 217 Ill. 2d at 436. In sum, the victim's three-word statement does not compare to the multiple, lengthy, detailed statements and doll demonstrations that the supreme court in Stechly found to be powerful evidence.

Forgery Conviction

Defendant also claims that the state failed to prove him guilty of forgery beyond a reasonable doubt. The due process clause of the fourteenth amendment to the United States Constitution "requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " People v. Cunningham, 212 Ill. 2d 274, 278 (2004), quoting In re Winship, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1073 (1970).

When we review a claim that the evidence was insufficient to sustain a conviction, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Cunningham, 212 Ill. 2d at 278 (emphasis in original), quoting Jackson v. Virginia, 443 U.S. 307, 319, 61 L.Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); People v. Hunter, 331 Ill. App. 3d 1017, 1025 (2002). "The Jackson standard applies in all criminal cases, regardless of the nature of the evidence." Cunningham, 212 Ill. 2d at 279. In applying this standard, "[a] reviewing court must allow all reasonable inferences from the record in favor of the prosecution." Cunningham, 212 Ill. 2d at 280.

Defendant claims on appeal that the State failed to prove forgery beyond a reasonable

doubt, because the indictment alleged that the check was not written by the victim when the State's evidence showed that almost all of the check was actually written by the victim.

Count XVI, the forgery by delivery count of the indictment,[14] alleged that the defendant:

"with intent to defraud, knowingly delivered a document to wit: a

check number 1602, dated August 8, 2001, in the amount of

$7,000.00, on the account of Juanita Cartman, drawn on Bank One,

made payable to Charles Spicer, apparently capable of defrauding

another in such a manner that it purported to have been made by

Juanita Cartman, knowing that it was not made by Juanita Cartman,

in violation of Chapter 720 Act 5 Section 17-3(a)(2) of the Illinois

Compiled Statutes 1992 as amended."

Section 17-3(a)(2) states: "A person commits forgery when, with intent to defraud, he knowingly: *** (2) issues or delivers such document knowing it to have been thus made or altered," 720 ILCS 5/17-3(a)(2)(West 2000). "[S]uch document" is defined as:

"any document apparently capable of defrauding another in

_____

[14]The indictment alleged two counts of forgery: forgery by knowingly altering a document, in violation of section 17-3(a)(1); (720 ILCS 5/17-3(a)(1)(West 2000)); and forgery by knowingly delivering a document, in violation of section 17-3(a)(2)(720 ILCS 5/17-3(a)(2)(West 2000)). In the jury charge, the trial court instructed the jury on only the latter type of forgery, forgery by delivery.

such manner that it purports to have been made by another or at
another time, or with different provisions, or by authority of one
who did not give such authority," (720 ILCS 5/17-3(a)(1)(2000).

In essence, the defendant claims that the indictment [15]charged the first clause[16] of the above statutory definition, that the check "purports to have been made by another," when the State's evidence proved that most of the check was not "made by another" but in fact was made by the victim herself.

The only evidence presented at trial concerning the making of the check came from the written statement signed by defendant. The defendant stated that the victim made out the check except for the payee line, which the defendant made out to himself. The defendant's statement was corroborated by the testimony of the bank teller, who stated that "[t]he payee was filled in, but it wasn't the account holder's handwriting."

Defendant claims that the case at bar is similar to People v. Lindquist, 97 Ill. App. 3d 894 (1981). See also People v. Rennels, 227 Ill. App. 3d 263 (1992). In Lindquist, the defendant, as

---

[15]The jury charge also stated that the jury had to find that "the defendant knowingly issued or delivered a check which he knew had been made or altered so that it appeared to have been made by another."

[16]It is curious that, in a case such as this where the crime was perpetuated by duress and threat of force, neither the indictment nor the jury instructions charged the third clause: "by authority of one who did not give such authority." 720 ILCS 5/17-3(a)(1)(West 2000).

30

estate executor, had the authority to write checks on the estate account. <u>Lindquist</u>, 97 Ill. App. 3d at 895. The State claimed that he committed forgery when he wrote checks to withdraw funds for his own purposes. <u>Lindquist</u>, 97 Ill. App. 3d at 895. The appellate court stated that it was surprised that the defendant was not charged with theft, but held that he was not guilty of forgery. <u>Lindquist</u>, 97 Ill. App. 3d at 895.

The <u>Lindquist</u> case is completely different from the case at bar. Unlike the defendant in <u>Lindquitst</u>, the defendant in the case at bar had no authority either to write checks or to withdraw funds from the victim's account.

<u>People v. Murrah</u>, 255 Ill. App. 3d 742 (1993), cited by the State, is more instructive. In <u>Murrah</u>, the defendant was charged with forgery in connection with an application for a corporate credit card. <u>Murrah</u>, 255 Ill. App. 3d at 743. The defendant's supervisor testified that when he signed the application for the corporate credit card, the line for "additional cards for other employees" was blank. <u>Murrah</u>, 255 Ill. App. 3d at 744. At some point, defendant's name was typed on that line, and the defendant received a credit card. <u>Murrah</u>, 255 Ill. App. 3d at 744. The appellate court found that the jury could have inferred that the defendant added his name after his supervisor had signed the application and that this inference was sufficient to support the charge that the defendant "made or altered a document" with intent to defraud. <u>Murrah</u>, 255 Ill. App. 3d at 747. The <u>Murrah</u> defendant's adding his name to the credit card application is similar to our defendant's adding his name to the victim's check. <u>People v. Kubanek</u>, 370 Ill. 646, 648 (1939) (defendant was guilty of forgery "by filing in the checks over the admittedly genuine signature of" the victim).

Thus, after reviewing the evidence in the light most favorable to the prosecution, this court finds that a rational trier of fact could have found the essential elements of the crime of forgery beyond a reasonable doubt.

<u>Closing Argument</u>

The defendant claims that he was denied a fair trial because the prosecutor in closing argument allegedly suggested that duress or coercion was an element of forgery, which is not the law.

The defendant waived this issue by failing to object at trial. <u>People v. Woods</u>, 214 Ill. 2d 455, 470 (2005) (error is not preserved for appellate review if defendant fails to "specifically object at trial"); <u>Piatowski</u>, 225 Ill. 2d at 564. As noted above, even when the defendant has failed to preserve an error for review, an appellate court may still review for plain error. The plain error doctrine allows a reviewing court to consider an unpreserved error when either (1) the evidence is "so closely balanced that the error alone threatened to tip the scales of justice against the defendant," or (2) the "error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." <u>Piatowski</u>, 225 Ill. 2d at 565; <u>Woods</u>, 214 Ill. 2d at 471. " 'In both instances, the burden of persuasion remains with the defendant.' " <u>Piatowski</u>, 225 Ill. 2d at 564, quoting <u>People v. Herron</u>, 215 Ill. 2d 167, 187 (2005).

As noted above, before we may examine either prong of the plain error doctrine, we must first determine whether there was any error at all. <u>Piatowski</u>, 225 Ill. 2d at 565 (plain error doctrine requires "first" that an error occurred); <u>People v. Nicholas</u>, 218 Ill. 2d 104, 121 (2006) (where "there was no error at all," there cannot be plain error); <u>People v. Johnson</u>, 218 Ill. 2d

32

125, 139 (2005) ("Clearly, there can be no plain error if there is no error"). For a prosecutor's closing remarks to constitute error, they must fall outside the "wide latitude" accorded a prosecutor in making a closing. People v. Nicholas, 218 Ill. 2d 104, 121 (2006); People v. Hart, 214 Ill. 2d 490, 513 (2005) ("[t]he law gives a prosecutor wide latitude in argument"). "In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields." Nicholas, 218 Ill. 2d at 121; Hart, 214 Ill. 2d at 513. "A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context." Nicholas, 218 Ill. 2d at 122.

The defendant claims that the prosecutor erred in closing argument when he made the following two remarks. First, the prosecutor stated: "It's her writing [on the check]; but make no mistake about it, he's the one that made the check. He just used her hands to do it." Second, during rebuttal, the prosecutor stated that it was unreasonable for the defense to argue that "[s]he wasn't forced to write out that check."

The defendant cannot now object to the prosecutor's remark in rebuttal when defense counsel invited the alleged error. A defendant cannot complain on appeal about an error that was "procured or invited by the defendant" at trial. People v. Harvey, 211 Ill. 2d 368, 386 (2004); People v. Bush, 214 Ill. 2d 318, 333 (2005); People v. Caffey, 205 Ill. 2d 52, 114 (2001). The prosecutor made the rebuttal remark in response to defense counsel's remarks in the defense closing that the State had failed to prove that the defendant "made her write him a check." Defense counsel argued in closing that the State had failed to prove:

"whether it [the check] was given to him willingly or not by Juanita

33

Cartman, whether she knew he had it, whether she wrote it out for him under force, duress, we don't know these things. They haven't been proved."

In closing, the defense put forth the "theory" that the elderly victim was acting not out of duress but out of confusion:

"Now here is a theory *** Ms. Cartman would not be the first elderly person to lose control of a large sum of money they did not mean to lose. She would not be the first person who wrote out a check with too many zeroes on the end or wrote a check thinking they were paying for something and found out later they were never going to get it."

Defense's repeated comments about lack of force or duress certainly invited the prosecutor's rebuttal comment to the jury that "you don't believe *** for one minute" the defense assertion that "[s]he wasn't forced to write out that check." People v. Sutton, 316 Ill. App. 3d 874, 893 (2000) ("[w]here there are allegations of prosecutorial misconduct [during closing], arguments of both the prosecutor and defense counsel must be reviewed in their entirety").

As for the first allegedly improper comment, that the defendant forced the victim to write the check, the defendant claims that this remark was a "misstatement" by the prosecutor that duress or force was an element of fraud. First, the statement was factually not a "misstatement" but a more than reasonable inference to be drawn from the evidence presented at trial. Second, the prosecutor never told the jury that duress or force was an element of fraud; and to the extent

34

that the jury was laboring under that misapprehension, the court properly instructed the jury about the elements of fraud. The defendant has not challenged any aspect of the jury charge on appeal. Viewing the closing in its entirety and in context, this court cannot find that the two challenged remarks constituted reversible error. Nicholas, 218 Ill. 2d at 122 (closing "must be viewed in its entirety" and "remarks must be viewed in their context").

Even if there was error, it did not rise to the level of plain error. First, the evidence supporting the forgery charge was not closely balanced. Piatowski, 225 Ill. 2d at 565 (plain error if evidence is "so closely balanced that the error alone threatened to tip the scales of justice against the defendant"); Woods, 214 Ill. 2d at 471. On one side of the scale, the evidence of forgery included: (1) defendant's signed and detailed statement concerning the making of the check; (2) the fingerprint expert's testimony about the defendant's fingerprint on the check; (3) the teller's testimony concerning the defendant's presentation of the check at the bank, and the fact that the payee was in a different handwriting than the balance of the check; and (4) testimony by the teller, the security guard, and the police officer about the defendant's immediate flight out of the door of the bank, over a fence at a construction site and finally hiding under a porch of a nearby building. People v. Harris, 225 Ill. 2d 1, 23 (2007) ("evidence of flight" is generally "admissible as proof of consciousness of guilt"); People v. Hart, 214 Ill. 2d 490, 519 (2005) (same). On the other side of the scale, there was no evidence disputing the forgery. Far from being closely balanced, the scales tipped heavily toward the jury's verdict of forgery. In Piatowski, the Illinois Supreme Court recently held that the evidence in the case before it was not closely balanced where the State presented "no physical evidence to connect defendant" to the

crime and "no inculpatory statements by defendant." Piatowski, 225 Ill. 2d at 567. In contrast to Piatowski, the case at bar included both physical evidence, such as the check with defendant's fingerprint, and the defendant's highly inculpatory statements, as well as the teller's eyewitness testimony about the check's presentation and separate handwriting for the line of the payee, and the defendant's flight.

Second, if there was an error in the prosecutor's closing argument, it was not so serious that it affected the fairness of the defendant's trial. Piatowski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471. As discussed above, the first allegedly improper remark was invited by defense counsel; and the second remark was a factual assertion reasonably drawn from the evidence which did not state that duress or force was an element of forgery. Thus, even assuming there was an error, the defendant has failed to show that it rose to the level of plain error.

Sentencing Hearing

Defendant claims that he was denied a fair sentencing hearing when he received the maximum sentence of 30 years for aggravated sexual assault. Defendant claims that the sentencing court erred: (1) by relying on a police report for the facts of defendant's prior conviction; (2) by considering the victim's age as an aggravating factor when age was already an element of the offense; and (3) by failing to consider mitigating factors, such as defendant's lack of a lengthy criminal record. In his brief to this court, the defendant concedes that he waived these issues by failing to raise them properly below and that the plain error doctrine applies.

"It is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." People v. Jackson, 375 Ill. App.

3d 796, 800 (2007). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." Jackson, 375 Ill. App. 3d at 800. Although the sentencing court in the case at bar chose to give the maximum sentence, that sentence was still within the statutory range (720 ILCS 5/12-14(d)(1)); and defendant has not claimed on appeal that his sentence was "manifestly disproportionate" to the crime.

First, with respect to the police report, there is no evidence that the sentencing court relied on it for purposes of sentencing. At the sentencing hearing, the prosecutor informed the court that the defendant had pled guilty on April 6, 1993, to attempted robbery and aggravated battery of an 88-year-old victim, for which the defendant received a sentence of three years. The defense did not dispute the fact of the conviction or the age of the victim, at sentencing or on this appeal. [17]

The prosecutor then related the following facts from a detective's report about the 1993 case:

> "In a very similar manner, the facts involve the defendant talking his
>
> way into her apartment, asking for money, taking her into her
>
> bedroom. When she refused to give him money, slapping and

---

[17]At sentencing, the defendant disputed having committed the aggravated battery but admitted the conviction. Defendant claimed that he pled guilty in 1993 in order to "[g]et it over with, they came to me with the battery charge and I took."

hitting this victim who sustained injuries in that case, a small cut to the right side of the face, a bruise to the left chest area and a minor bruise to the neck area. *** The victim also related to the police that a neighbor called during this incident and the neighbor even told the police that the victim said to her, he's back again and he's hitting me. And heard the victim say ouch, stop hitting me."

During the sentencing hearing, the trial court did not refer to the details contained in the police report. With respect to the 1993 case, the trial court focused primarily on the victim's age, noting that it was another aggravated battery "with another elderly woman." In announcing the sentence, the trial court stated:

"This is two offenses for violence against women who are senior citizens. And real senior citizens. We are not talking about somebody coming home from working out at the health club who happens to be 61 or 65. That would make him a senior citizen. Those women were well beyond that age.

I think that society requires based on facts of the case and background, on count nine will merge into count seven, on count seven I sentence you to 30 years [in the] Illinois Department of Corrections."

The above remarks indicate that the trial court relied primarily not on the details in the police report, but on the facts of the conviction and the prior victim's age, facts that the defense

38

has never disputed or raised as an issue on this appeal. Kliner, 185 Ill. 2d 81, 172, (1998) (noting that "the trial judge did not cite to any of the evidence here challenged"). "[W]hen the trial judge is the sentencer, it is presumed that the trial judge based his decision upon competent and reliable evidence." Kliner, 185 Ill. 2d at 174. The defendant in the case at bar has failed to rebut that presumption.

Even if the sentencing court had relied on the police report, that fact alone would not require resentencing. The defendant objects to admission of the report as hearsay. However, a court is permitted to consider hearsay information at sentencing. People v. Harris, 375 Ill. App. 3d 398, 409 (2007). The "ordinary rules of evidence which govern at trial are relaxed at the sentencing hearing." Harris, 375 Ill. App. 3d at 408. At sentencing, a "hearsay objection affects the weight rather than the admissibility of the evidence." Harris, 375 Ill. App. 3d at 409.

It is left to the "sound discretion" of the trial court to determine whether hearsay is reliable enough to weigh in sentencing. Harris, 375 Ill. App. 3d at 410. The Illinois Supreme Court has held that a sentencing court may consider even uncharged conduct contained in a rap sheet. People v. Kliner, 185 Ill. 2d 81, 171, 172 (1998) ("defendant's Chicago police department 'rap sheet' which indicated defendant's prior arrests" was relevant to sentencing "because it provides an insight into the defendant's character").

Second, the defendant claims that the trial court improperly considered the victim's age as an aggravating factor in sentencing when the victim's age was already an element of the offense. Aggravated sexual assault requires, as an element of the offense, finding one factor from a list of aggravating factors. (720 ILCS 5/12-14 (a)(West 2000)). One of these factors is that "the victim

was 60 years of age or over when the offense was committed." 720 ILCS 5/12-14(a) (5)(West 2000)).

"As a general rule, the consideration of a factor which is necessarily implicit in an offense cannot be used as an aggravating factor in sentencing." People v. Burge, 254 Ill. App. 3d 85, 88 (1993). "Stated differently, a single factor cannot be used both as an element of an offense and as a basis for imposing 'a harsher sentence than might have otherwise have been imposed.' People v. Phelps, 211 Ill. 2d 1, 11-12 (2004) quoting People v. Gonzalez, 51 Ill. 2d 79, 83-84 (1992). "Such dual use of a single factor is often referred to as 'a double enhancement.' " Phelps, 211 Ill. 2d at 12, quoting Gonzalez, 151 Ill. 2d at 85.

In support of his claim that the trial court erred in sentencing him, the defendant cited People v. White, 114 Ill. 2d 61 (1986), which the supreme court called a "textbook example of double enhancement." Phelps, 211 Ill. 2d at 12. The supreme court explained that: "In White, this court held that *** the victim's age cannot form the basis for an extended-term sentence where the defendant is convicted of aggravated battery of a child." Phelps, 211 Ill. 2d at 12. However, White is distinguishable from the case at bar because in the case at bar, age was not used as the basis for an extended-term sentence. The trial court in the case at bar sentenced the defendant within the statutory maximum for the offense. The other two cases cited by defendant in support of his claim also involved extended-term sentences, and are similarly distinguishable.[18]

---

[18]The defendant also cited People v. Conover, 84 Ill. 2d 400 (1981), and People v. Ferguson, 132 Ill. 2d 86 (1989). Conover and Ferguson involved the question of whether the

Although it is a "general rule" that an element of the offense should not also be used as a sentencing factor, "this rule should not be applied rigidly." Burge, 254 Ill. App. 3d at 88. "The rule that a court may not consider a factor inherent in the offense is not meant to be applied rigidly, because sound public policy dictates that a sentence be varied in accordance with the circumstances of the offense." People v. Cain, 221 Ill. App. 3d 574, 575 (1991). Thus, a sentencing court may consider "the degree of harm threatened" in an armed robbery although threatened harm is implicit in the offense (Burge, 254 Ill. App. 3d at 89); and the degree of harm in an aggravated criminal sexual assault, although "serious harm *** [is] an element implicit in the crime." People v. Smith, 215 Ill. App. 3d 1029, 1038 (1991).

In assessing the degree of harm, a sentencing court may consider, for example, "whether the victim is particularly young" even though the victim's age is an element of the sexual assault count for which defendant was convicted. People v. Thurmond, 317 Ill. App. 3d 1133, 1144 (2000) (emphasis omitted). In Thurmond, the sexual assault victim was only 12 years old. Thurmond, 317 Ill. App. 3d at 1136. The appellate court held that "the trial court did not err by

---

aggravating factor permitted the sentencing court to impose "an extended-term sentence" (Ferguson, 132 Ill. 2d at 95) or "a more severe penalty" (Conover, 84 Ill. 2d at 405) for the offense than the legislature had authorized for the offense. These cases are distinguishable from the case at bar because the trial court in the case at bar sentenced the defendant within the statutory maximum for the offense.

recognizing that [the victim] was particularly young at the time of the offense." Thurmond, 317 Ill. App. 3d at 1144-45. The appellate court stated "there is a difference between being under age 18 and being significantly under age 18." Thurmond, 317 Ill. App. 3d at 1144.

Just as a trial court may consider whether a sexual assault victim was particularly young, a trial court may also consider whether a victim was particularly senior. In the case at bar, the trial court did not err when it considered that the victim was 15 years above the age required in the statute. The victim in the case at bar was 75 or 76 years old at the time of the offense; and the age required for aggravated sexual assault was only 60, 720 ILCS 5/12-14(a)(5)(West 2000).

Third, the defendant claims that the sentencing court failed to consider mitigating factors, such as defendant's lack of a lengthy criminal record, his associate's degree, his work history and his honorable discharge from the military. Defense counsel stated most of these facts at sentencing; and the trial judge acknowledged that he had "[r]eviewed the background" and that "there are many things that go into sentencing."

"[T]here is no mandatory requirement that the trial judge recite all" the mitigating and aggravating factors "before imposing sentence." Jackson, 375 Ill. App. 3d at 802. "It is presumed that the trial judge considered all of the factors unless the record indicates to the contrary." Jackson, 375 Ill. App. 3d at 802. We can find no evidence of "an abuse of discretion" in the sentencing record. Jackson, 375 Ill. App. 3d at 800.

Correction of Mittimus

Both the State and the defense agree that the mittimus must be corrected. The "Order of Commitment and Sentence" states that the defendant was "adjudged guilty of the offense(s)

enumerated below" and then lists three separate offenses: (1) "AGG. CRIM SEX ASSAULT/FELONY"; (2) "AGG. CRIM SEX ASLT/VICTIM>60"; and (3) "FORGERY/ISSUE/DELIVER DOCUMENT."

At sentencing, the trial court merged count IX, aggravated criminal sexual assault based on the victim's age, with count VII, aggravated criminal sexual assault predicated on its commission during a residential burglary. However, the jury had acquitted defendant of residential burglary.

The jury found defendant guilty of, and the trial court entered judgment and sentenced defendant on one count of aggravated criminal sexual assault and on one count of forgery. Accordingly, the order must be corrected to eliminate "AGG CRIM SEX ASSAULT/FELONY." "Pursuant to Supreme Court Rule 615 (134 Ill. 2d R. 615), a reviewing court on appeal may correct the mittimus at any time, without remanding the cause to the trial court." People v. Jones, 371 Ill. App. 3d 303, 310 (2007).

CONCLUSION

For the foregoing reasons, the defendant's conviction and sentence are affirmed, and the mittimus is corrected.

Affirmed.

CAHILL, P.J., and WOLFSON, J., concur.

_____

Please use the
following form:]

THE PEOPLE OF THE STATE OF ILLINOIS

Plaintiff-Appellee,

v.

CHARLES SPICER,

Defendant-Appellant.

Complete
  TITLE
of Case.

---

Docket No.

COURT

Modified
Opinion on
Denial of
Rehearing.
FILED

No. 1-05-3358
Appellate Court of Illinois
First District, First Division

FEBRUARY 25, 2008
(Month, Day and Year)

---

JUSTICES

JUSTICE ROBERT E. GORDON delivered the Modified Opinion on Denial of Rehearing of the court.

CAHILL, P.J., and WOLFSON, J., concur.

---

APPEAL from the]
Circuit Court
of Cook County;]
the Hon:_____
Judge Presiding]

Lower Court and Trial Judge(s) in form indicated in margin:

Appeal from the Circuit Court of Cook County.

Honorable Dennis A. Dernbach, Judge Presiding.

---

For APPELLANTS
John Doe of
Chicago.
For APPELLEES,
Smith and
Smith, of
Chicago.
Brown,
of Counsel.

Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.

Office of the State Appellate Defender
Michael J. Pelletier - Deputy Defender
Lisa Southerland - Assistant Appellate Defender
Chicago, Illinois   60601
Attorneys for Appellant

Richard A. Devine - State's Attorney
County of Cook
Chicago, Illinois 60602
Attorneys for Appellee
Attn: James E. Fitzgerald, Veronica Calderon-
    Malavia, Tasha Marie Kelly, Shannan McFadden
    OF COUNSEL

Also add atty. ]
for third party]
appellants

No. 1-05-3358

or appellees.  ]
_____(USE REVERSE SIDE IF NEEDED_____